UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 08-21192-CIV-GARBER

ST. PAUL MERCURY
INSURANCE COMPANY,

    Plaintiff/Counter-Defendant,
v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
Hamilton Bank, N.A.,

    Defendant/Counter-Plaintiff
_____/

ST. PAUL MERCURY INSURANCE
COMPANY,

    Third Party Plaintiff,
v.

RONALD LACAYO

    Third Party Defendant.
_____/

**ORDER GRANTING PLAINTIFF/COUNTER-DEFENDANT
ST. PAUL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

THIS CAUSE is before the Court upon Plaintiff/Counter-Defendant St. Paul Mercury Insurance Company's ("St. Paul") Motion for Partial Summary Judgment (the "Motion"). The Court has reviewed the following: St. Paul's Motion, Concise Statement of Undisputed Material Facts, and Supporting Memorandum of Law (D.E. 65), the Defendant/Counter-Plaintiff Federal Deposit Insurance Corporation, as Receiver for Hamilton Bank, N.A.'s ("FDIC") Response in Opposition to St. Paul's Partial Motion for Summary Judgment and Memorandum of Law in Support of the FDIC's Cross-Motion for Partial Summary Judgment (D.E. 87), the Affidavit of

Randall D. Lehner (D.E. 87-2), the FDIC's Response to St. Paul's Statement of Undisputed Material Facts and Additional Statement of Undisputed Material Facts (D.E. 88), the Appendix to FDIC's Response to St. Paul's Statement of Undisputed Material Facts and Additional Statement of Undisputed Material Facts (D.E. 89), St. Paul's Reply in Further Support of its Motion for Partial Summary Judgment (D.E. 99), St. Paul's Response to FDIC's Additional Statement of Undisputed Material Facts and St. Paul's Opposition Statement of Undisputed Material Facts (D.E. 112), and Appendix to St. Paul's Response to FDIC's Additional Statement of Undisputed Material Facts and St. Paul's Opposition Statement of Undisputed Material Facts (D.E. 113).  This Court has also heard the argument of respective counsel at a hearing on November 19, 2009.

St. Paul seeks partial summary judgment that there is no coverage under a Financial Institution Bond (the "Bond") issued by St. Paul to Hamilton Bank, N.A. ("Hamilton") for certain loan transactions identified in the pleadings as the "Russian Swaps," the "AHMSA Swaps", the "SIAPSA Deposits", the "Prestomatic Loan," and the "Leyva Loan."  For the reasons set forth below, St. Paul's Motion is GRANTED IN PART AND DENIED IN PART.

## I.  Factual Background

The undisputed material facts relevant to the Motion are as follows.

**A.     Hamilton Bank And The "Russian Swaps"**

Hamilton was a subsidiary of Hamilton Bancorp, Inc. (collectively, "Hamilton" or "the Bank") with its principal place of business in Miami, Florida. (FDIC Counterclaim (D.E. 9) ¶ 7; St. Paul's Answer and Affirmative Defenses to FDIC's Counterclaim (D.E. 30) ¶ 7.)  At all relevant times, Eduardo Masferrer ("Masferrer") was Hamilton's Chairman, Chief Executive Officer, and single largest shareholder.  (St. Paul's Statement of Undisputed Material Facts  ("St.

Paul's SOF") (D.E. 65) ¶¶ 2-3; FDIC's Response to St. Paul's SOF and Additional Statement of Undisputed Material Facts ("FDIC's SOF") (D.E. 88) ¶¶ 2-3; Hamilton Bancorp SEC Filings, Exhibit "B" to St. Paul's Motion (D.E. 65).)

In 1997, Hamilton purchased a number of Russian loans or debt instruments as investment assets. (Transcript of trial testimony of Juan Carlos Bernace in *U.S. v. Masferrer* ("Bernace Tr.") April 24, 2006, p. 106;[1] *U.S. v. Masferrer,* 514 F.3d 1158, 1160 (11th Cir. 2008).) During the summer of 1998, those Russian loans significantly declined in value. (Bernace Tr. April 24, 2006, pp. 106, 113, 118-24; Transcript of trial testimony of John Jacobs in *U.S. v. Masferrer* ("Jacobs Tr.") May 4, 2006, pp. 124-27; Jacobs Tr. May 5, 2006, pp. 3-7.) In September 1998, Hamilton sold those Russian loans to third parties in exchange for purchasing a number of other debt instruments (the "Russian Swaps"). (Transcript of trial testimony of Ian Tweedley in *U.S. v. Masferrer* ("Tweedley Tr.") April 27, 2006, pp. 2-4; Deposition of Peter Kennedy filed in *U.S. v. Masferrer* ("Kennedy Depo. Tr.") March 16, 2005, pp. 46-49, 146-48; Jacobs Tr. May 5, 2006, pp. 56-59, 122; Jacobs Tr. May 8, 2006 p. 36.) Masferrer was subsequently convicted of various fraud and obstruction of justice charges relating to those Russian Swaps in a criminal proceeding in this District. (Verdict Form in *U.S. v. Masferrer* FDIC App. Ex. 5; Second Amended Judgment in a Criminal Case filed on May 14, 2007 in *U.S. v. Masferrer,* Case 1:04-cr-20404-KMM (D.E. 598); *U.S. v. Masferrer,* 514 F.3d 1158.)

On January 11, 2002, federal regulators closed Hamilton and the FDIC was appointed as Hamilton's receiver. (St. Paul's Complaint (D.E. 1) ¶ 7; FDIC Answer (D.E. 9) ¶ 7.)

---

[1] The *U.S. v. Masferrer* trial transcripts referred to herein were filed as Appendix Exhibits (D.E. 113) to St. Paul's Response to FDIC's Additional Statement of Undisputed Material Facts and St. Paul's Opposition Statement of Undisputed Material Facts ("St. Paul's Response SOF") (D.E. 112).

**B.     The Bond**

By letter dated January 11, 2002, Hamilton purported to send written notice to St. Paul of a possible claim under the Bond. (St. Paul's Complaint ¶ 6; FDIC Answer ¶ 6; Exhibit "J" to St. Paul's Response SOF.) The Bond was effective November 8, 2000 for a three-year period through November 8, 2003. (Exhibit "A" to St. Paul's Complaint.) It provides coverage, in pertinent part, for defined losses resulting directly from certain dishonest or fraudulent acts committed by Hamilton employees. Specifically, Insuring Clause (A) of the Bond provides coverage for fidelity loss as follows:

> Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
>
> Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
>
> (a) to cause the Insured to sustain such loss; and
>
> (b) to obtain financial benefit for the Employee or another person or entity.
>
> *However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more of the parties to the transactions and has received, in connection therewith, a financial benefit.*
>
> As used throughout this Insuring Clause, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions. (emphasis added)

The FDIC seeks coverage under the Bond for a claimed loss allegedly resulting from the Russian Swaps. (FDIC Counterclaim (D.E. 9) ¶¶ 3, 25-54, 87.) St. Paul denied coverage for that claim for a number of reasons and filed the present action seeking a declaratory judgment that there is no coverage under the Bond for the Russian Swaps. (St. Paul's Complaint (D.E. 1) ¶¶ 11.b, 16; St. Paul's Amended Answer and Affirmative Defenses to FDIC's Counterclaim (D.E.

30) ¶¶ 3, 20, 22, 94-106, 108-15.)  As to the present motion, St. Paul claims that the FDIC has not proven that Masferrer, as the alleged dishonest "Employee," received the requisite "financial benefit" in connection with the Russian Swaps.  In response, the FDIC claims that Masferrer did receive a financial benefit under the terms of the Bond through the sales of Hamilton stock located in valid, irrevocable trusts that Masferrer set up for the benefit of his children

**C.     The Masferrer Trusts**

In January 1997, more than 1½ years before the Russian Swaps, Masferrer created two irrevocable trusts for the benefit of his children and his wife's children from a prior marriage (the "Trusts").  (Trust Agreement, dated January 31, 1997, (the "Trust"), Exhibit "J" to St. Paul's Motion; Eduardo A. Masferrer 1997 Grantor Retained Annuity Trust ("GRAT Trust") dated January 31, 1997, Exhibit "K" to St. Paul's Motion.)  The Trusts were formalized in writing and, by their express terms, were irrevocable and not subject to amendment.  (Trust Agreement, FIFTH; GRAT Trust I and IX.)

In 1997, Masferrer transferred some of his Hamilton stock to those Trusts.  (Trust Agreement, Schedule; GRAT Trust, Schedule A.)  A share certificate dated March 14, 1997, for the Hamilton stock was issued in the name of Masferrer's sister, Marta D. Masferrer, the trustee of the Trusts as follows:  "Marta D. Masferrer, trustee u/a/d 1/31/97." (Exhibit "N" to St. Paul's Motion.)  Those shares of Hamilton stock comprised the only corpus of the Trusts. (PaineWebber Account Statements for the Trust and GRAT Trust Accounts, Exhibits "C" and "D" to St. Paul's Motion.)

In May 1998, brokerage accounts to hold the Hamilton stock were opened at PaineWebber for "Marta D. Masferrer, TTEE of the Eduardo Masferrer Trust" and "Marta D. Masferrer, TTEE Eduardo A. Masferrer GRAT Trust."  (*Id.*)  That Hamilton stock, issued in the

trustee's name, was deposited into those PaineWebber accounts. (PaineWebber Account Statements, Exhibits "C" and "D" to St. Paul's Motion; Letter of May 4, 1998, from Marta Masferrer to PaineWebber, Exhibit "N" to St. Paul's Motion.)

Masferrer and his sister, Marta, stated to PaineWebber early on that they wanted the Trusts to sell the Hamilton stock, diversify the Trusts' holdings, and generate income for the childrens' education and expenses. (Deposition of Marissa McDermott, Exhibit "G" to St. Paul's Motion ("McDermott Depo.") pp. 31-33, 45-46, 61, 99-100, 106-09; Deposition of Jorge Gomez, Exhibit "H" to St. Paul's Motion ("Gomez Depo.") pp. 14-16, 33-34, 62-66, 113, 126; Deposition of Marta Masferrer, Exhibit "L" to St. Paul's Motion ("Marta Masferrer Depo.") pp. 17-18, 26, 84, 98.) Clearly, the Trusts' agreements required the sale of the stock so as to meet the financial distribution obligations of the Trustee under the terms of the Trusts. (Trust Agreement, FIRST, Sections 1-4; *see also* GRAT Trust, III. B., V., B.)[2] Beginning in November 1998 and continuing intermittently until January 2002, when Hamilton was closed, the Trusts' accounts sold a portion of their Hamilton stock. (PaineWebber Account Statements, Exhibits "C" and "D" to St. Paul's Motion; Chart summarizing sale dates, Exhibit "Q" to St. Paul's Motion.) Although there is evidence that Masferrer "was involved" in the decisions as to when to sell the Hamilton stock from the Trusts' accounts (Trial testimony of Jorge Gomez in *U.S. v. Masferrer* ("Gomez Tr.") p. 157; Gomez Depo. pp. 34, 63-65, 71-72, 94-95, 101-03), it was only Marta who formally authorized, either in writing or orally, every sale of stock by the Trusts, while she was Trustee. (McDermott Depo. pp. 41-43, 65, 102, 106, 130-32; Gomez Depo. pp. 70-74, 126; Marta

---

[2] After the two-year GRAT Trust term expired, the GRAT Trust assets poured into the remaining Trust (McDermott Depo. pp. 88-92; Gomez Depo. pp. 90-93; PaineWebber Account Statements, Exhibits "C" and "D" to St. Paul's Motion; Letter of May 27, 1999, from Marta Masferrer to PaineWebber, Exhibit "W" to St. Paul's Motion); from this point on, the Trust Agreement governed the distributions of income and principal to, and the withdrawal of principal by, the children. (Trust Agreement, FIRST, Sections 1-4; GRAT Trust III.B.)

Masferrer Depo. pp. 106-10; Letter of August 29, 1998, from Marta Masferrer to PaineWebber, Exhibit "O" to St. Paul's Motion; and Letter of August 3, 1999, from Marta Masferrer to PaineWebber, Exhibit "R" to St. Paul's Motion.)   Marta Masferrer served as Trustee of the Trusts until in or about September 2000 when she was replaced by a corporate Trustee, Comerica. (Trust Agreement, "Acceptance of Appointment by Successor Trustee," Exhibit "Z" to St. Paul's Motion; McDermott Depo. pp. 61-65.)

The PaineWebber representatives testified that even when Masferrer would call Paine Webber to say the Trusts should sell stock, they would always check first with Marta, so their authority and orders came only from each of the respective Trustees. (McDermott Depo. pp. 41-43, 65-66, 102, 106, 113-14, 130-32; Gomez Depo. pp. 70-74, 126; Gomez Grand Jury Testimony at 14-15, 19, 22.) Further, before any sale of Hamilton stock took place, because that stock was restricted or control stock under Rule 144 of the Securities and Exchange Act, approval from the PaineWebber Restricted Stock Department was required. (McDermott Depo. p. 108; Gomez Depo. pp. 75-77, 94-96, 99-100; PaineWebber Account Statements, Exhibits "C" and "D" to St. Paul's Motion; Form 144 Documentation, Exhibits "E" and "F" to St. Paul's Motion.)

The proceeds from the sales of the Hamilton stock remained as assets of the Trusts, going directly into PaineWebber RMA Money Market Accounts set up for each of the Trusts. (McDermott Depo. pp. 124-25; Gomez Depo. pp. 103-06; PaineWebber Account Statements, Exhibits "C" and "D" to St. Paul's Motion.) Masferrer's children, as the named beneficiaries of the Trusts, were the only ones who received the proceeds from the sales of that stock. (PaineWebber Account Statements, Exhibits "C," "D," and "U" to St. Paul's Motion; McDermott Depo. pp. 31-33, 35-36, 93-100; Gomez Depo. pp. 77-79.) Masferrer did not receive any money

from the Trusts' accounts nor did he receive any money from the sales of the Hamilton stock from those accounts. (Deposition of Marta Masferrer attached as Exhibit "L" to St. Paul's Motion ("Marta Masferrer Depo.") p. 127; McDermott Depo. p. 68; Gomez Depo. p 77; *see also* Checks f/b/o named beneficiaries attached as part of Exhibit "C" to St. Paul's Motion; PaineWebber Account Statements, Exhibits "C" and "D" to St. Paul's Motion.)

## II. Standard of Review And Burden Of Proof

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving party is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Additionally, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The FDIC, acting as receiver for the insured, has the burden to prove that a claimed loss is covered under the Bond. *Morrison Grain Co. Inc., v. Utica Mutual Insurance Co.,* 632 F.2d 424, 430 (5th Cir. 1980) (under Florida law, the burden of proof is on the insured to show that a loss arose from a covered peril); *Steil v. Florida Physicians' Insurance Reciprocal,* 448 So.2d 589, 592 (Fla. Dist. Ct. App. 1984) (as a condition precedent to any recovery against the insurer, the claimant must prove that a claim against the insurer is within coverage of the policy).

## III. Discussion

**A.     The Russian Swaps**

St. Paul maintains that the FDIC has failed to prove that the Russian Swaps are covered under the Bond because the FDIC has been unable to find, and has offered no evidence, that Masferrer received the requisite financial benefit in connection with the Russian Swaps. The FDIC claims that the sales of Hamilton stock located in the Trusts satisfy the Bond's financial benefit requirement.[3] This Court agrees with St. Paul. The FDIC has not presented any evidence to this Court that Masferrer received an actual financial benefit from the sales of Hamilton stock from the Trusts. The FDIC has provided no proof that Masferrer received any money from the Trusts' accounts or that he received, from the beneficiaries or otherwise, any of the proceeds generated from the sales of Hamilton stock from those accounts. Instead, the FDIC claims that Masferrer somehow received a financial benefit from the sales of that Hamilton stock to the extent he continued to exercise "dominion and control" over that stock even after he had transferred it to the Trusts. The FDIC claims that because Masferrer's sister Marta was a mere "nominee" trustee, Masferrer never completed the transfer of that Hamilton stock to the Trusts as a matter of law. Thus, the FDIC argues, Masferrer should still be deemed the owner of that stock, and thereby be deemed to have received a financial benefit when that Hamilton stock was sold from the Trusts' accounts, even though the FDIC acknowledges that Masferrer never received any of the proceeds generated from those sales. (FDIC's Response in Opposition to St. Paul's Motion and Memorandum of Law in Support of the FDIC's Cross-Motion ("FDIC's Opposition") (D.E. 87) pp. 4-5, 26-35; St. Paul's SOF ¶¶ 23, 39; FDIC's SOF ¶¶ 23, 39.) The Court notes that this was the FDIC's only argument regarding the financial benefit required

---

[3] The parties are in agreement as to the operative language of the Bond for purposes of St. Paul's Motion, namely, that Masferrer, as the alleged dishonest "Employee," must have received a "financial benefit" in connection with the Russian Swaps, which are the "Loans" at issue. In addition, that "financial benefit" had to be something other than employee benefits earned in the normal course of employment such as salaries, commissions, and bonuses. (Bond, Insuring Clause (A))

under the bond.  Therefore, the Court's analysis is limited to the determination of whether there was delivery of the stock.  This Court disagrees with the FDIC and finds that Masferrer did not receive the type of financial benefit required by the Bond when the Trusts eventually sold the Hamilton stock which he transferred to the Trusts.

It is clear that Masferrer did in fact transfer the stock to the Trusts and that the Trusts were valid trusts.  Without the effective transfer of the Hamilton stock to the Trusts, the Trusts would have no corpus and would therefore be invalid.  It is well-settled under Florida law that "[i]t is essential that a trust have a corpus or there can be no valid present trust. . . .  The failure to provide a trust corpus would negate the existence of a trust."  *Vaughan v. Boerckel,* 963 So.2d 915 (Fla. 4 DCA 2007), *quoting,* J. Grimsley, *Florida Law of Trusts* Sec. 9-1 (4th Ed.).  *See Brevard County v. Ramsey,* 658 So.2d 1190 (Fla. 5 DCA 1995) ("The transfer of title to a trustee is the event that brings the trust into existence"), *citing,* 76 Am.Jur.2d *Trusts* Sec. 52 (1992).

The FDIC has conceded that the Trusts were valid.  (FDIC's Opposition pp. 33-34).  All of the evidence submitted to the Court reflects that the Trusts continued to exist and operate for years after their creation, filing income tax returns, paying tax on earnings from the sales of stock located in the Trusts' accounts, and making distribution payments to the named beneficiaries.  (PaineWebber Account Statements, Exhibits "C," "D," and "U" to St. Paul's Motion; Checks made payable to the U.S. Treasury, f/b/o the named beneficiaries, part of Exhibit "C" to St. Paul's Motion; Letter of April 13, 2000, from Marta Masferrer to PaineWebber, Exhibit "Y" to St. Paul's Motion; McDermott Depo. pp. 92-95; Gomez Depo. pp. 77-79.)

Moreover, the issuance of the Hamilton stock in Marta Masferrer's name, as trustee of the Trusts, is *prima facie* evidence that she, as trustee, owned that stock.  *See Sackett v. Shahid*, 722

So.2d 273, 275 (Fla. 1st DCA 1998). Thus, there is no basis to conclude that the Trusts were anything other than valid Trusts whose corpus consisted of the Hamilton stock Masferrer gifted to his and his wife's children. Furthermore, by placing the stocks in an irrevocable trust, Masferrer showed an intent to permanently divest himself of the stocks. Formal delivery of the stock certificates, coupled with this irrevocable intent to give away the stocks is sufficient to complete delivery. *See Maxcy's Estate v. C.I.R.*, 441 F.2d 192, 194 -95 (5th Cir. 1971).[4]

The FDIC's allegations that Marta was a mere "nominee" trustee are unfounded in law for purposes of determining whether Masferrer validly gifted the Hamilton stock to these Trusts. The FDIC does not cite to one case or rule of law, nor has the Court been able to find one, that states a trustee of a valid trust cannot take advice from the settlor of that trust as to when to sell trust property or that doing so invalidates the legal transfer of property into a trust.

Instead, the cases cited by the FDIC to support its argument are inapposite and have no bearing on the present issue. The test to determine a valid transfer, or completed *inter vivos* gift, under Florida law is intent, delivery, and acceptance. *Mulato v. Mulato,* 705 So.2d 57, 61 (Fla. 4th DCA 1997)*; Tanner v. Robinson,* 411 So.2d 240, 242 (Fla. 3rd DCA 1982) (delivery of stock to a brokerage firm completes a valid common law gift of those securities). Here the undisputed facts, as recited above, show this test was met.

The cases the FDIC relies on concern issues arising almost exclusively out of estate litigation in which the courts had to determine whether the property at issue was in fact gifted by the decedent during his lifetime, as an *inter vivos* gift, or whether the decedent intended that the property pass to the beneficiary only at the decedent's death through his estate. Under the facts of those cases, the decedent's intent to make an *inter vivos* gift was not clear and the donor of the

---

[4]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

gift either retained possession of the stock certificates, the stock remained in the donor's name, or the donor received the dividends, rather than the donee. Where the elements of the transfer test for an *inter vivos* gift were not clearly met, the courts looked to determine the decedent's subjective intent by analyzing his "control" over the property to determine whether that transfer *inter vivos* was complete. *See Webster v. St. Petersburg Fed. Sav. & Loan Ass'n,* 20 So.2d 400, 401-04 (Fla. 1945) (holding the property was not transferred *inter vivos* where the decedent titled the investment share certificates jointly in his and the donee's names, retained exclusive possession of the certificates, and collected all income on the deposits; further, there was no evidence of a trust, either written or oral); *Mulato v. Mulato,* 705 So.2d at 62 (finding the donor's intention was a gift only upon her death, not an *inter vivos* transfer, where the donee never had possession of the stock certificates, never received or made a claim for any of the dividends from the stock, and did not know the value or identification of the stock); *Freedman v. Freedman,* 345 So.2d 834, 836-37 (Fla. 3rd DCA 1977) (finding the evidence insufficient to establish an *inter vivos* gift where the decedent retained title to the stock jointly with the donee and received all of the dividends from that stock during his lifetime); *Kuebler v. Kuebler,* 131 So.2d 211, 212-19 (Fla. 2nd DCA 1961) (finding the evidence insufficient to establish an *inter vivos* gift where the decedent retained title to the stock jointly with the donee and where the donee testified that he did not believe the decedent intended to transfer the stock to him during the decedent's lifetime).

Here, contrary to that line of cases, Masferrer's intent to transfer the Hamilton stock to the Trusts is clear. He executed two irrevocable trust agreements creating the Trusts; Hamilton re-issued Hamilton stock in the name -- and solely in the name -- of the trustee; the trustee then sent that Hamilton stock to PaineWebber with instructions to open accounts for the Trusts; PaineWebber opened accounts in the names of the Trusts; Marta Masferrer, as trustee,

authorized every sale of Hamilton stock by the Trusts; all of the proceeds from the sales of that stock remained as assets of the Trusts, going directly into money market accounts at PaineWebber for each Trust; and the Trusts later made distribution payments to the named beneficiaries–-and only the named beneficiaries—of the Trusts.  Under Florida law, Masferrer effected a valid transfer of stock and a completed *inter vivos* gift to the Trusts.

The FDIC also relies on tax cases to support its "dominion and control" argument.  Those cases are similarly inapposite and unpersuasive.  Again, in those cases the settlor continued to receive an economic benefit from the property by, for example, collecting income on the trust property.  Because of that economic benefit, the settlor, and not the trust, was taxed on that property.  *See, e.g., Helvering v. Clifford,* 309 U.S. 331, 332-37 (1940); *Warren v. Commissioner of Internal Revenue,* 45 B.T.A. 379, 385-86 (1941), *aff'd,* 133 F.2d 312 (6th Cir. 1942).  To this end, this Court notes that the record evidence reflects that the Trusts, not Masferrer, paid the taxes on all income earned in the Trusts' accounts.  (Checks made payable to the U.S. Treasury, f/b/o the named beneficiaries, part of Exhibit "C" to St. Paul's Motion; Letter of April 13, 2000, from Marta Masferrer to PaineWebber, Exhibit "Y" to St. Paul's Motion; McDermott Depo. pp. 92-95; Gomez Depo. pp. 77-79.)  Thus, this is yet another fact reflecting the valid transfer of Hamilton stock to the Trusts.

The most the FDIC has shown this Court is that on occasion, Masferrer indirectly – via calls to PaineWebber - influenced the decisions of his sister Marta, as trustee, as to when to sell the Hamilton stock located in the Trusts' accounts.  Influence over a trustee, however, does not invalidate the transfer of property to a trust nor otherwise establish a financial benefit to Masferrer under the Bond.  Because the undisputed facts clearly evidence that Masferrer transferred the Hamilton stock to the Trusts and did not receive any financial benefit when the

Trusts sold that stock, this Court finds that, as a matter of law, the FDIC has failed to prove the requisite "financial benefit" under the Bond. Accordingly, the Court does not need to address the FDIC's Cross Motion for Summary Judgment.

**B.   Request For Further Discovery**

The FDIC, in addition to opposing summary judgment on the factual record, seeks to delay entry of summary judgment at this time in order to take additional, yet unspecified discovery relating to the use of the Trusts' funds by the beneficiaries. (FDIC Opposition (D.E. 87) p. 37 n.4; Lehner Affidavit (D.E. 87-2)) The FDIC claims that such discovery may show some financial benefit to Masferrer. (Lehner Affidavit ¶ 5) Unlike the corresponding argument and affidavit filed by St. Paul in response to the FDIC's Cross-Motion, the FDIC has failed to satisfy Rule 56(f) of the Federal Rules of Civil Procedure.

First, the FDIC has cross-moved on the very issue of Masferrer's receipt of financial benefit and claimed coverage as a matter of law. (FDIC Opposition and Cross-Motion (D.E. 87)) With that cross-motion, the FDIC concedes that the record is sufficient to determine this issue. *Almeida v. Amazon.com, Inc.,* 456 F.3d 1316, 1327 n.6 (11th Cir. 2006).

Second, under Rule 56(f), a court may postpone ruling on a summary judgment motion to allow the defending party to take additional discovery, only upon a sufficient showing "by affidavit that, for *specified reasons*, it cannot present facts essential to justify its opposition" (emphasis added). The Eleventh Circuit requires that a party "must conclusively justify his entitlement to the shelter of rule 56(f) by presenting specific facts explaining the inability to make a substantive response as required by rule 56(e) and by specifically demonstrating how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Wingster v. Head,* 318

Fed.Appx. 809, 813-14 (11th Cir. 2009).  *See also O'Brien v. Seay,* 263 Fed.Appx. 5, 7 (11th Cir. 2008) (a party seeking to use Rule 56(f) may not "simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts").  The FDIC has failed to meet this requirement.

Third, the FDIC does not provide any adequate reason for failing to conduct such discovery to date.  The FDIC was appointed as receiver of Hamilton in January 2002.  The FDIC has sought coverage under the Bond since that time.  The last deposition in this case occurred on April 21, 2009.  (*See* Gomez Depo.)  St. Paul's Motion was filed on June 18, 2009.  (D.E. 65)  The FDIC's Opposition was filed on July 31, 2009.  (D.E. 87)  The FDIC has had ample time to undertake efforts to obtain any necessary discovery it deemed appropriate on this narrow issue of a financial benefit to Masferrer. Its reliance now on "vague assertions that additional discovery will produce needed facts, particularly where . . . ample time and opportunities for discovery have already lapsed" does not justify the FDIC's entitlement to "the shelter of Rule 56(f)." *Wingster v. Head,* 318 Fed.Appx. at 814 (internal quotations omitted).

Finally, the FDIC's Rule 56(f) affidavit fails to explain how such discovery would be relevant in light of St. Paul's showing, in its Motion, that any use of the Trusts' funds by the beneficiaries could not financially benefit Masferrer and St. Paul's argument that there can be no "connection" (as the Bond requires) between the Russian Swaps, which occurred in September 1998, and the income distributions made from the Trusts to the beneficiaries only years later. (St. Paul's Motion pp. 28-35)

This Court therefore finds that St. Paul is entitled to summary judgment at this time declaring there is no coverage under the Bond for the Russian Swaps.

### C.     The Additional Claims

St. Paul also seeks summary judgment on the four other loan transactions for which the FDIC originally sought coverage under the Bond, identified as the SIAPSA Deposits, the AHMSA Swaps, and the Prestomatic and Leyva Loans.  Because the FDIC has sought coverage for these additional claims, St. Paul requested in its Complaint and in its Motion that this Court rule on the issue of coverage.  (St. Paul's Complaint ¶¶ 2, 11.a, c-e, 14-16; St. Paul's Motion pp. 35-36)  In response to St. Paul's Motion, the FDIC argues that because it is not, now, seeking coverage for these additional claims, the issue is moot and a declaratory judgment is therefore inappropriate.  (FDIC Opposition p. 37)

Entry of summary judgment for these claims is unnecessary, and the Court declines to issue an advisory opinion.  *Miccosukee Tribe of Indians v. U.S.*, 259 F. Supp. 2d 1237, 1245 (S.D. Fla. 2003) (holding that no case or controversy existed to declare plaintiff's rights where alleged threatened harm had ended).  Those claims are not at issue in this litigation, by the FDIC's own admission.  FDIC Answer ¶ 11. Accordingly, it is hereby

ORDERED that St. Paul's Motion is GRANTED in part and DENIED in part.  The FDIC's Cross Motion for Summary Judgment is DENIED AS MOOT.  It appears to the Court that this resolves the entire dispute.  The parties may file a brief with the Court within thirty (30) days of this Order indicating the extent of their agreement that the dispute is now entirely resolved.

DONE AND ORDERED in Chambers at Miami, Florida this 30th day of March, 2010.

_____
BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE