UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-21192-CIV-GARBER

ST. PAUL MERCURY INSURANCE
COMPANY,

    Plaintiff/Counter-Defendant,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
Hamilton Bank, N.A.,

    Defendant/Counter-Plaintiff.
_____/

ST. PAUL MERCURY INSURANCE
COMPANY,

    Third party Plaintiff,

v.

RONALD LACAYO

    Third Party Defendant.
_____/

## ORDER

THIS CAUSE is before the Court upon plaintiff/counter-defendant St. Paul Mercury Insurance Company's Motion for Final Summary Judgment (DE 166). The Court has also received the defendant/counter-plaintiff Federal Deposit Insurance Corporation's response (DE 181) and St. Paul's reply (DE 191) thereto. Both parties additionally filed statements of facts (DE 167 and 182), respective responses thereto (DE 182 and 192), and various exhibits. After holding a hearing on the

matter, and upon a thorough review of the record and the filings in this matter, the Court hereby DENIES St. Paul's motion for the following reasons.

I. **Background**

The parties are in agreement regarding the majority of the facts pertinent to the consideration of this Motion. Their discord relates primarily to the significance, relevance, and characterization of these historical facts. Where the facts are disputed, this is noted and the Court, as it must on a motion for summary judgment, makes all reasonable inferences in favor of the FDIC, the nonmoving party.

A. **The Bond**

St. Paul issued an insurance bond to Hamilton Bank which became effective on November 8, 2000. The bond provided coverage for, among other things, losses resulting from dishonest or fraudulent acts committed by Hamilton employees, as defined under the bond. In order for a loss on a loan to be covered, the employee committing the fraudulent or dishonest act had to have been in collusion with one or more of the parties to the transaction and had to have received a financial benefit in connection with the loss. In addition, the loss at issue must have been discovered during the effective period of the bond. Under the terms of the bond, discovery is deemed to occur:

> when a titled officer, branch manager or risk manager of the Insured, first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of the loss may not then be known.

The effective period ended in the evening hours of January 11, 2002, when Hamilton was closed by the Office of the Comptroller of the Currency (the "OCC") and taken over by the FDIC as receiver. The Parties agree that, in order for the loss to be covered by the bond, a titled officer, branch manager, or risk manager of Hamilton, had to have discovered it prior to Hamilton's closing.

B.     **The Golden Vision Loan**

As receiver, the FDIC is seeking coverage under the bond for losses incurred on a $15 million loan made by Hamilton to Golden Vision Financial Corp. in December 2000. The Golden Vision loan was approved by six bank officers and directors, including Eduardo Masferer, Hamilton's Chairman and Chief Executive Officer and Ronald Lacayo, a Hamilton director.[1]   The OCC considered this loan to be a loss as of December 31, 2000, within just days of its funding. As a result of its investigation of the Golden Vision loan in 2001, the OCC concluded that the loan was "unsafe and unsound," "severely inadequate in all respects," "misleading," "highly speculative," and a "problem loan."

C.     **Discovery and Notice of the Loss**

L. Timothy Harris, executive vice president and chief financial officer of Hamilton, sent a notice to St. Paul, signed moments before the bank was closed, on January 11, 2002, informing it that information had been discovered indicating that losses covered under the bond had been or would be incurred as a result of, among other transactions, the Golden Vision loan. Throughout 2001, Harris had met with Charles "Mike" Rardin, the on-site examiner at Hamilton for the OCC, regarding the Golden Vision loan. Rardin conveyed his concerns about the loan to Harris and showed Harris that the loan file had almost no documentation in it. Rardin also explained to Harris that the loan had been classified by the OCC as a complete loss at the time it was made.

On the day the bank was closed, Harris also met with Kristin Merritt, an attorney with the OCC. Harris says that Merritt explained to him that the OCC believed that the Golden Vision loan

---

[1] St. Paul has reserved the right to later contest whether Lacayo was a covered employee under the bond. The Court will assume for the purposes of considering the present motion, without deciding, that Lacayo falls under the bond's definition of a covered employee.

involved fraudulent or dishonest transactions.[2] Specifically, Merritt told Harris that: the $15 million loan had been wired to Golden Vision in an unnecessarily circuitous manner; the loan's purpose, which was in part to buy distressed assets from Unibanco, was not properly documented; Masferer owned significant stock in Unibanco; Masferer withheld certain loan documents from examiners who were reviewing the Golden Vision loan; there was no credit analysis done for the loan; Lacayo had performed the due diligence on the loan in El Salvador; no security interest in the loan had been perfected; and the files were devoid of information about who the principals of the loan were. Harris stated that, between what he had known previously and the new information relayed to him by Merritt on the day the bank closed, he felt he had a reasonable basis to sign the letter that put St. Paul on notice of the loss.

II. **Issue**

The FDIC has claimed the Golden Vision loan loss under its insurance bond, alleging as the basis for coverage Lacayo's dishonest or fraudulent conduct and Lacayo's receipt of kickbacks out of the loan proceeds. In its motion for summary judgment, St. Paul argues that the information known to Harris prior to the bank's closing was not, as a matter of law, sufficient to establish that Harris had "discovered" the loss, as defined by the terms of the bond. In making this argument, St. Paul, while arguing that there are no disputed issues of material fact, contends that the Court should not consider all of the facts that Harris was aware of, as listed above, because some of those facts ultimately proved to be untrue. Therefore, according to St. Paul, the loss was not discovered during

---

[2]On the one hand St. Paul complains that it is improper for the FDIC to claim that Merritt told Harris that the Golden Vision loan appeared to have been a fraudulent or dishonest transaction since, according to St. Paul, such statements are: (1) not facts, but rather conclusions; (2) immaterial and irrelevant; and (3) based on "facts" which turned out to be untrue. On the other hand St. Paul also seems to deny altogether that Merritt made the statements regarding the fraudulent or sham transaction. The Court finds this to be a disputed issue of fact and considers it in the light most favorable to the FDIC.

the effective period of the bond and thus there is no coverage. The FDIC disagrees, contending that, the facts that Harris was aware of were indeed sufficient to support his discovery of the loss, thus triggering coverage.

At the heart, then, of the parties' discord is what a reasonable person would assume based on the facts known to Harris prior to the bank's closing. St. Paul argues that no reasonable person could assume, based on the subset of the above facts that it insists the Court should consider, that a loss of the type covered by the bond had been incurred. As a preliminary matter, the Court, as described more fully below, has not been persuaded, as urged by St. Paul, to disregard any of the facts that Harris claims to have been aware of. In considering, then, all of the facts as relayed in Section I., the Court finds that St. Paul has not carried its burden and finds that there is a genuine issue of material fact as to whether a reasonable person would have assumed, based on the facts known to Harris, that a loss of a type covered by the bond had been incurred.

III. **Standard of Review**

On a motion for summary judgment, a court must construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Rule 56(a) of the Federal Rules of Civil Procedure mandates that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court notes that it "may be extremely difficult . . . to determine on summary judgment when the insured discovered a loss caused by employee dishonesty." Resolution Trust Corp. v. Fid. & Dep. Co. of Md., 205 F.3d 615, 632 (3d Cir. 2000). Further, "[i]f reasonable minds could differ on the

inferences arising from undisputed facts, then a court should deny summary judgment." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997)(quotations omitted).

IV.  **Discussion**

All that is required under the bond to satisfy the requirements for discovery is that Harris became "aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred . . . even though the exact amount or details of the loss may not then be known." In order to establish an actual loan loss, however, under the bond, the FDIC must show that: (1) the loss resulted directly from dishonest or fraudulent acts committed by an employee; (2) the dishonest or fraudulent acts were committed by that employee with the manifest intent to (a) cause the insured to sustain such a loss; and (b) obtain financial benefit for that employee or another person or entity; (3) the employee was in collusion with one or more parties to the transaction; and (4) that employee actually received a financial benefit in connection with the transaction. But just because all of these elements must be met before a loss is covered under the bond, doesn't mean that all of these elements must be established by facts known to the insured before discovery is deemed to have occurred. Rather, it is enough if the totality of facts known to the insured, in this case, known to Harris, would have caused a reasonable person to "<u>assume</u>" that a type of covered loss had taken place. By the bond's terms, knowledge of the exact amount or details of loss need not be known before discovery can take place.

Here, before the termination of the bond period, Harris knew or had been informed that: (1) the loan had almost no documentation in it; (2) almost as soon as the loan had been made, the OCC deemed it a total loss; (3) the OCC believed the loan involved fraudulent or dishonest transactions; (4) the $15 million dollar loan had been wired to Golden Vision in an unnecessarily circuitous manner; (5) the loan documentation failed to specify: (a) that the proceeds were to be used to buy

distressed assets from Unibanco; or (b) who the principals of the loan were; (6) Masferer, one of the signatories to the loan, owned significant stock in Unibanco; (7) Masferer withheld, in his private files, certain loan documents from examiners who were reviewing the loan; (8) the credit analysis done for the loan was inadequate; and (9) no security interest in the loan had been perfected. Considering these facts in the light most favorable to the FDIC, the Court finds that St. Paul has not carried its burden in establishing that no reasonable person would have assumed, based on the facts known to Harris, that a loss of a type covered by the bond had occurred.

    A.    **Knowledge of Wrong-Doing by a Particular Employee Is Not Required Under the Plain Meaning of the Bond**

One of St. Paul's main arguments is that Harris could not have discovered the Golden Vision loan loss within the bond's coverage period because he wasn't aware of Lacayo's, as opposed to Masferer's, specific fraudulent conduct; or that Lacayo, as opposed to Masferer, had personally benefitted from the transaction. That is, St. Paul argues, because the FDIC's complaint ultimately hinges on **Lacayo's** wrongdoing and financial benefit in relation to the loan, discovery couldn't have occurred because, as of the bond's termination, Harris was aware of facts that lead him to assume that **Masferer**, rather than Lacayo, had masterminded and benefitted from the alleged sham. As recited, above, however, the bond's language, does not require as much. The Court agrees with the FDIC that the plain language of the bond does not demand that the insured know specifically which employees were involved in the scheme for discovery to have occurred. That Harris may have initially been mistaken about who actually masterminded and benefitted from the fraud, does not diminish the fact that it was reasonable for him to assume that the losses incurred by reason of the Golden Vision loan were due to an employee's or multiple employees' fraud or dishonesty and to

assume that at least one of the wrongdoing employees had benefitted from the allegedly sham transaction.

Additionally, based on its definition of "facts," St. Paul urges the Court to disregard some of the facts that Harris was aware of that later proved to be untrue. But St. Paul interprets the bond's use of the word "facts" as requiring a level of precision that is not warranted. Even the definition urged by St. Paul is at odds with this interpretation. St. Paul quotes a definition from The American Heritage Dictionary of the English Language, reciting that a fact is "[i]nformation presented as objectively real." Even if the Court were to adopt this definition, the record shows that the "facts" that Harris claims to have been aware of were "presented" to him as "objectively real." Furthermore, according to Black's Law Dictionary, one of the definitions of a fact is an "actual or **alleged** event or circumstance, as distinguished from its legal effect, consequence, or interpretation." Black's Law Dictionary (9th ed.)(emphasis added); see also U.S. v. Jones, 856 F.2d 146, 150 (11th Cir. 1988)(citing to Black's definition of fact); Kaplun v. Att'y Gen., 602 F.3d 260, 269 (3d Cir. 2010)(same); U.S. v. Pollard, 416 F.3d 48, 55 (D.C. Cir. 2005)(same). Black's also includes a quote from Wigmore under its definition of fact: "A fact is any act or condition of things, assumed (for the moment) as happening or existing." John. H. Wigmore, A Student's Textbook of the Law of Evidence 7 (1935)(emphasis omitted). The Court is satisfied that the information that Harris was aware of falls under the definition of "facts."

  B. **The Bond Language Itself and Eleventh Circuit Case Law Commenting on Similar Language Establish a Low Threshold for Discovery**

St. Paul also insists that the totality of facts known to Harris prior to the bank's closing amounted only to an indication that the loss at issue was due to bad business judgment and unsound practices. That is, St. Paul argues, while the facts known to Harris might have prompted him to be

**suspicious**, such facts did not amount to **discovery** of wrongdoing that resulted in the loss. While the Court agrees with St. Paul that mere suspicion or awareness of poor or irregular business practices cannot alone constitute discovery of dishonesty that resulted in a covered loss, e.g., Resolution Trust, 205 F.3d at 630, the facts known to Harris rise above that level. To support its position, St. Paul sets forth its contention that a higher showing is required to trigger discovery than is actually demanded by the contractual discovery language of the bond and Eleventh Circuit case law opining on the same. Contrary to St. Paul's arguments, the Court has not been persuaded to disregard either the language of the bond or Eleventh Circuit case law.

Many of the cases cited to by St. Paul to support its position are simply not applicable because the bonds at issue in those cases did not contain discovery language similar to that at issue in this case and so the same standard cannot be said to have been applied. See Am. Sur. Co. v. Pauly, 170 U.S. 133 (1898); FDIC v. Aetna Cas. & Sur. Co., 426 F.2d 729 (5th Cir. 1970); U.S. Fid. & Guar. Co. v. Empire State Bank, 448 F.2d 360 (8th Cir. 1971); FDIC v. Lott, 460 F.2d 82 (5th Cir. 1972); Fid. & Dep, Co. of Md. v. Hudson United Bank, 653 F.2d 766 (3d Cir. 1981); Utica Mutual Ins. Co. v. Fireman's Fund Ins. Cos., 748 F.2d 118 (2d Cir. 1984); Block v. Granite State Ins. Co., 963 F.2d 1127 (8th Cir. 1992).

Most of these cases unequivocally required actual knowledge of the fraud or dishonesty resulting in the covered loss. Pauly, 170 U.S. at 160 (finding discovery not to have taken place until the insured had actual knowledge of the fraudulent acts resulting in the loss); Aetna Cas. & Sur., 426 F.2d at 739 (requiring actual knowledge of some specific fraudulent or dishonest act to trigger discovery); Lott, 460 F.2d at 87 (citing the Pauly standard); Hudson United, 653 F.2d at 774 (citing the Pauly standard and defining discovery "as occurring when a bank has sufficient knowledge of specific dishonest acts to justify a careful and prudent person in charging another with dishonesty

or fraud"); Utica Mutual, 748 F.2d at 122 (citing the Pauly standard).  On the other hand, some of the other cases cited to by St. Paul, though dealing with bonds that didn't have the same discovery language at issue in this case, still referenced similar language in defining the triggering of discovery.  However, despite referencing such language, these cases still went on to establish a higher threshold for the triggering of discovery.  Thus, in Empire State, despite reciting a standard containing language similar to that in the bond now at issue, the court articulated that, in order for there to be discovery, a reasonable person would have to **appreciate that a loss had actually been sustained because of an employee's dishonesty**.  448 F.2d at 366.  The bond at issue there also did not grant the insured the leeway of not requiring knowledge of the "exact amount or details" of the loss.  The standard set forth in Empire State, rather, required a greater and more concrete showing than the bond now before the Court.  Additionally, the standard applied in Empire State involved a level of subjectivity that is absent from the analysis presently before the Court.  That is, in Empire State, the court required not only knowledge of facts that could lead to discovery of a covered loss, but also a requirement that the bank employee alleged to have discovered the loss also be **aware of the significance of the known facts**.  Id. at 365.  Here, according to the plain language of the bond, it is sufficient for discovery that, based on the known facts, a reasonable person **would have assumed that a loss of the type covered by the bond had occurred**.  Additionally, in Block, much like in Empire State, although the discovery standard enunciated by the court is similar in many respects to the bond language at issue here, that standard also did not provide that the insured need not know "the exact amount or details" of the loss for discovery to occur.  963 F.2d 1127.  So, despite reciting case law that only required the insured to know facts which would lead a reasonable person to an assumption that a "shortage" existed, the court there still articulated a higher threshold for discovery.  Id. at 1129-30.  Furthermore, in Block, the court specifically found that the outside expert

investigators hadn't even suggested, within the effective period of the bond, that a covered loss might have occurred. Id. This is decidedly at odds to the case now before the Court. Here, the OCC clearly articulated, before the bond had terminated, its belief that a covered loss had occurred.

On the other hand, the cases cited to by St. Paul that **did** involve similar bond language are unavailing because, despite the similarity in the discovery language, the standards enunciated by those courts required a higher showing than that required by the Eleventh Circuit. See First Sec. Sav. v. Kan. Bankers Sur. Co., 849 F.2d 345 (8th Cir. 1988); FDIC v. Aetna Cas. & Sur. Co., 903 F.2d 1073 (6th Cir. 1990); Cal. Union Ins. Co. v. Am. Diversified Sav. Bank, 948 F.2d 564 (9th Cir. 1991). As a prime example, the court in California Union, despite the lenient discovery language in the bond, similar to that here, enunciated a standard requiring actual discovery of both the loss and the dishonesty. 948 F.2d at 564 (quotation omitted). Controlling Eleventh Circuit case law does not require as much. In Royal Trust Bank, N.A. v. Nat'l Union Fire Ins. Co. of Pittsburgh, the Eleventh Circuit found that the same bond language "does not require that the bank have enough information to charge its employee with fraud or dishonesty. All that is required is that it have enough information to assume that the employee has acted fraudulently or dishonestly." 788 F.2d 719, 721 n. 2 (11th Cir. 1986). In the Royal Trust case, it was enough to trigger discovery that the insured was aware: that an employee frequently well-exceeded her authority in approving payments for a certain account; and that that account appeared almost daily on the bank's "suspect" report with increasingly higher negative balances. This is a markedly lower threshold than that urged by St. Paul as well as than that set forth in the cases cited to by St. Paul.

In sum, then, even though, in some of the cited cases, discovery was deemed not to have been triggered, those cases do not support St. Paul's position because the courts in those cases enunciated a higher discovery threshold than that required by the plain meaning of the bond language here.

Furthermore, the Court notes that the factual showings in those cases were all substantially weaker than the facts set forth in the case now before the Court. And lastly, though other courts in other circuits may have advanced discovery thresholds that require a stronger showing by the parties to establish discovery, courts in this circuit have not.

V.   **Conclusion**

Taken as a whole, the facts in this case, when considered in the light most favorable to the FDIC, could lead a trier of fact to conclude that a reasonable person would have assumed, based on all of the circumstances, that a loss of a type covered by the bond had been incurred. This is not a case, as St. Paul posits, where a receiver has sent a vague notice letter to an insurer about ill-defined losses that the insured speculates should generally be covered under the bond. Instead, the Golden Vision Loan is specifically identified and particular facts have been articulated which Harris was aware of that could have caused a reasonable person to assume that a loss of a type covered by the bond had been incurred. That Harris was mistaken about who actually masterminded the fraud and benefitted therefrom does not diminish the point that a fact-finder could conclude that a reasonable person would have assumed that the losses incurred by reason of the Golden Vision loan were due to an employee's fraudulent or dishonest conduct and that that employee had benefitted therefrom. The Court cannot say that, as a matter of law, this suite of facts would cause a reasonable person to, **at most**, merely suspect that fraudulent or dishonest conduct was afoot. Accordingly, and upon due consideration, it is hereby

ORDERED that St. Paul's Motion for Summary Judgment (DE 166) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida this 29th day of March, 2011.

_____
BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE